67 F.3d 1462
 64 USLW 2304, 19 Employee Benefits Cas. 2033,
95 Cal. Daily Op. Serv. 8124,
95 Daily Journal D.A.R. 13,943,
Pens. Plan Guide P 23913S
 Robert L. RICHARDSON; William Alexander; Larry L. Aman;
Kenneth R. Anderson; Jimmie L. Arrington, et al.,
Plaintiffs-Appellants,
v.
The PENSION PLAN OF BETHLEHEM STEEL CORPORATION AND
SUBSIDIARY COMPANIES; The Pension Trust of Bethlehem Steel
Corporation and Subsidiary Companies; The General Pension
Board; Michael Dopera, Secretary of the General Pension
Board; Bethlehem Steel Corp., Defendants-Appellees.
 No. 93-36089.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1994.
Decided Oct. 17, 1995.
 
 Steven Bert Frank, Frank & Rosen, Seattle, Washington, for plaintiffs-appellants.
 Richard J. Omata, Karr, Tuttle, Campbell, Seattle, Washington, for defendants-appellees.
 Before: JOHN T. NOONAN, Jr., O'SCANNLAIN, and LEAVY, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must delve into complex issues of statutory and contractual interpretation as we determine a company's liability for shutdown pension benefits following sale and eventual closure of a steel plant.
 
 
 2
 * The appellants are former employees of Bethlehem Steel Corporation ("BSC"), who seek various pension benefits from their former employer. While they were employed at BSC, BSC and the United Steel Workers of America entered into a Pension Agreement ("Agreement"), a collectively bargained agreement governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1001 et seq. A different document, the Pension Plan of BSC ("Plan"), implements the terms of the Agreement. The Plan is administered by the General Pension Board.
 
 
 3
 At issue here are so-called Rule-of-65 and 70/80 benefits provided under sections 2.6 and 2.7 of the Plan, respectively. These benefits are provided to employees who satisfy certain age and service requirements and whose "continuous service is broken by reason of a permanent shutdown of a plant."[1] For this reason, the benefits are termed "shutdown benefits."
 
 
 4
 The controversy surrounding the shutdown benefits began in 1982 when the BSC Board of Directors decided to divest the company of its West Coast properties. Because it was concerned about its potential liability for shutdown benefits, BSC added a new provision, section 5.3(c), to the Plan; that section authorized the General Pension Board to adopt rules and regulations which would provide that a particular sale would not be a break in service. BSC then began negotiating the sale of its Seattle division to Seattle Steel Inc. ("SSI"). BSC notified the United Steelworkers of America ("Union") that it believed that a sale to SSI would not constitute a shutdown if BSC sold the facility as a going concern. The Union disagreed, however, and filed a grievance, contending that the proposed sale constituted a shutdown under the labor and pension agreements, and that its eligible members were entitled to, among other things, Rule-of-65 and 70/80 benefits.
 
 
 5
 BSC could not consummate the sale until this issue was resolved; accordingly, BSC and the Union officials agreed to negotiate. As a result of these negotiations, the parties settled the Union's grievance through a Memorandum of Settlement ("MOS"), and on December 27, 1984, the MOS was ratified by a majority of Union members. The MOS states that the sale to SSI would not be considered a break in continuous service. In exchange for that concession, BSC promised to make cash payments to BSC employees. The amount of the payment depended on the employee's length of service. With regard to the employees' entitlement to future shutdown benefits, the MOS provides that "Bethlehem will provide a 48-month safety net if purchaser's business fails and Bethlehem does not cure the failure...."
 
 
 6
 After the MOS was ratified, the General Pension Board adopted the "Rules and Regulations Governing Continuous Service Under the Bethlehem Steel 1983 Hourly Pension Plan in Connection with the Sale of the Seattle Divisions of Bethlehem Steel Corporation" ("Rules and Regulations"). Like the MOS, these Rules and Regulations determined that the sale to SSI would not constitute a break in service for employees who were hired by SSI. BSC then sold its Seattle plant to SSI effective January 1, 1985.
 
 
 7
 In October 1990, more than five years after BSC sold the plant to SSI, SSI announced that it was going out of business. SSI sold its assets to Salmon Bay Steel Corporation and ceased operations in May 1991. Salmon Bay did not hire any of the former Seattle division employees, and the parties agree that SSI's sale to Salmon Bay was a shutdown.
 
 
 8
 After SSI closed, the former employees applied to the General Pension Board for shutdown benefits. The General Pension Board Administrator denied their claims on the ground that the MOS eliminated shutdown benefits after the forty-eight month safety net. The former employees brought this suit against the Pension Plan of BSC and various other defendants (collectively "BSC") to the district court which agreed with the General Pension Board Administrator and granted summary judgment to BSC. This appeal followed.
 
 
 9
 The former employees first contend that the MOS preserved their entitlement to shutdown benefits. In the alternative, they maintain that if the MOS is interpreted as eliminating their right to shutdown benefits after forty-eight months, then the MOS is an illegal amendment in violation of section 204(g) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1054(g). Finally, they challenge the district court's Rule 12(b)(6) dismissal of their claim that the General Pension Board breached its fiduciary duties under section 404(a) of ERISA, 29 U.S.C. Sec. 1104(a).
 
 II
 
 10
 In contrast to the General Pension Board Administrator ("Administrator") and the district court, the former employees interpret the MOS as preserving their right to shutdown benefits. We review the district court's grant of summary judgment de novo. Jones v. Union Pac. R.R., 968 F.2d 937, 940 (9th Cir.1992). However, the parties disagree as to whether we should review the Administrator's decision denying benefits de novo or for an abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). The district court declined to rule on the question because it found that the former employees' claims failed even under the more stringent de novo standard. We agree.
 
 
 11
 In determining that the MOS eliminated rights to shutdown benefits, the district court relied both on the language of the MOS and extrinsic evidence that showed that when the Union entered into the MOS, it understood it to preclude shutdown benefits unless SSI failed within forty-eight months. The former employees object both to the district court's conclusion and the method it used in reaching that conclusion.
 
 
 12
 ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Scott v. Gulf Oil Corp., 754 F.2d 1499, 1501 (9th Cir.1985). Rather, Congress intended that courts apply contract principles derived from state law but be guided by the policies expressed in ERISA and other federal labor laws. Id. at 1502.
 
 
 13
 Accordingly, we have held that terms in an ERISA plan should be interpreted " 'in an ordinary and popular sense as would a [person] of average intelligence and experience.' " Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir.1990) (quoting Allstate Ins. Co. v. Ellison, 757 F.2d 1042, 1044 (9th Cir.1985)). More specifically, we agree with the Sixth Circuit, which has stated that:
 
 
 14
 [w]hen disputes arise, courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties. The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion.
 
 
 15
 Armistead v. Vernitron Corp., 944 F.2d 1287, 1293 (6th Cir.1991) (citations omitted). Each provision in an agreement should be construed consistently with the entire document such that no provision is rendered nugatory. Id. Typically, however, when a plan is ambiguous, a court will examine extrinsic evidence to determine the intent of the parties. See Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232-33, 1236 (3d Cir.1991).
 
 
 16
 Here, the former employees maintain that the district court should not have considered extrinsic evidence of the parties' intent because the MOS is not ambiguous. They contend that, "read literally," the MOS unambiguously supports their claim for benefits. A review of the relevant provisions of the MOS reveals, however, that such argument is without merit.
 
 
 17
 Section IV of the MOS established a forty-eight month safety net during which time, BSC would pay shutdown benefits if SSI failed and BSC did not cure the failure. Section V.A of the MOS then provides that "[c]essation of Bethlehem employment with commencement of employment by purchaser will not be deemed a break in pension continuous service." Section V.B goes on to say that
 
 
 18
 Bethlehem will credit employee's continuous service with the purchaser as if it were Bethlehem employment for Bethlehem pension vesting and eligibility purposes. Accordingly, such continuous service will be treated as Bethlehem pension continuous service for eligibility for 65/10, 62/15, 30-year, 60/15 and deferred vested retirement, including meeting the various pension age requirements.
 
 
 19
 Read together, the above-quoted provisions indicate that service with SSI constitutes continuous service for purposes of the named pension plans but that shutdown benefits would be available only if SSI failed during the forty-eight month safety net. The former employees, however, read Section V.A and the first sentence of V.B to mean that their service with SSI will be treated as continuous service for all the pension plans. That reading would be entirely plausible were it not for Section IV and the remaining sentences of V.B. After Section V.A states that new employment with SSI "will not be deemed a break in continuous service," Section V.B goes on to list the various pension plans for which "service [with SSI] will be treated as Bethlehem pension continuous service." Notably, the list does not include Rule-of-65 and 70/80 shutdown benefits. Further, Section IV's safety net provisions provide a forty-eight month period during which BSC would pay shutdown benefits if SSI failed. That provision is inconsistent with the understanding that shutdown benefits would be available indefinitely.
 
 
 20
 The most that one can say in support of the former employees' position is that the MOS is ambiguous because it does not explicitly state that shutdown benefits are eliminated once the safety net has expired. That conclusion does not assist them, however, because a finding of ambiguity would permit us to examine extrinsic evidence to determine the parties' intent in entering into the MOS. The extrinsic evidence at issue here consists primarily of deposition testimony of Union negotiators who state that the Union understood the MOS to preclude shutdown benefits forever unless SSI failed within forty-eight months.[2]
 
 
 21
 Therefore, we agree with the district court that the MOS eliminated shutdown benefits after the forty-eight month safety net expired.
 
 III
 
 22
 BSC's former employees next argue that if the MOS is construed as wholly eliminating shutdown benefits after forty-eight months, then it is an illegal amendment in violation of 29 U.S.C. Sec. 1054(g). The district court rejected this claim, holding that the MOS and the Rules and Regulations were interpretations of the Agreement and the Plan rather than amendments thereto.
 
 29 U.S.C. Sec. 1054(g) provides:
 
 23
 (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan....
 
 
 24
 (2) For the purposes of paragraph (1), a plan amendment which has the effect of--
 
 
 25
 (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in the regulations), or
 
 
 26
 (B) eliminating an optional form of benefit with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfied (either before or after the amendment) the preamendment conditions for the subsidy.
 
 
 27
 Pursuant to the requirements of section 1054(g), we first must determine whether the MOS constituted an amendment of the Agreement and the Plan. We then must decide whether the shutdown benefits at issue here come within section 1054(g)'s protection.
 
 
 28
 * The district court found that section 1054(g) did not apply because the MOS and the Rules and Regulations were interpretations of the Agreement and Plan rather than amendments thereto. In support of that position BSC argues that the MOS and the Rules and Regulations merely apply certain provisions of the Pension Agreement and the Pension Plan to a particular set of circumstances: the sale of the Seattle plant to SSI as a going concern. According to BSC, neither the Plan nor the Agreement definitively answered whether BSC's sale of its Seattle facility would have been considered a permanent shutdown. The MOS and the Rules and Regulations answered that question and thus are merely interpretations of the existing provisions that concern shutdown benefits.
 
 
 29
 Although BSC's argument has surface appeal, we conclude, upon closer examination, that it is flawed. The MOS and the Rules and Regulations could plausibly be viewed as interpretations had they merely provided that the sale to SSI was not a shutdown. However, in addition, the MOS and the Rules and Regulations also eliminate shutdown benefits entirely after the safety net period expired. That provision cannot be considered an interpretation of any part of the Agreement or Plan. Indeed, BSC's elimination of shutdown benefits is analogous to the facts of Fentron Industries v. National Shopmen Pension Fund, 674 F.2d 1300 (9th Cir.1982). In Fentron Industries, we held that an amendment had occurred when the plan trustees canceled the employees' past service credits pursuant to a plan provision authorizing cancelation.[3] Here, the MOS went even further by eliminating an entire class of benefits. Such an alteration of a pension plan falls well within the plain meaning of the term "amendment."
 
 B
 
 30
 Our determination that the MOS "amended" the Agreement for purposes of section 1054(g) does not end our inquiry; the former employees must also satisfy section 1054's other requirements. To recap, section 1054(g) provides that an "accrued benefit" "may not be decreased by an amendment of the plan." An amendment which has the effect of eliminating or reducing an early retirement benefit or a retirement-type subsidy "shall be treated as reducing accrued benefits." 29 U.S.C. Sec. 1054(g)(2). Eliminating retirement-type subsidies is so treated, however, only if the participant satisfies the preamendment conditions for the subsidy "either before or after the amendment." Id.
 
 
 31
 * Are the shutdown benefits at issue here "retirement-type subsidies" protected by section 1054?
 
 
 32
 Congress indicated that it expected the Treasury Department to promulgate regulations defining the term "retirement-type subsidy," see 29 U.S.C. Sec. 1054(g)(2)(A); S.Rep. No. 575, 98th Cong.2d Sess. 30, reprinted in 1984 U.S.Code Cong. & Admin.News 2547, 2576; however, the Treasury Department has yet to do so. In that absence, courts have held that a retirement benefit is a retirement-type subsidy if the sum of the monthly payments for the participant's life exceeds what the participant would have received as normal retirement benefits. Ashenbaugh v. Crucible Inc., 854 F.2d 1516, n. 6 (3d Cir.1988), cert. denied, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989); Costantino v. TRW, Inc., 13 F.3d 969, 972 (6th Cir.1994). Accordingly, the Third Circuit held that a plan that paid normal retirement benefits at an earlier age was a retirement subsidy; that is, because the benefits were received at an earlier age and were not actuarially reduced, the sum of the payments over the participant's lifetime would be greater than it would have been had the participant retired at the normal retirement age.
 
 
 33
 BSC's shutdown benefits consist of two parts: $400 per month, paid until age sixty-two and an additional amount, equal to the normal retirement benefit, paid until death. These shutdown benefits thus constitute a retirement-type subsidy because the sum of the monthly payments for life exceeds what the Bethlehem employees would have received as normal retirement benefits.
 
 
 34
 The legislative history for section 1054(g) also supports this conclusion. The Senate Report states that:
 
 
 35
 a subsidy that continues after retirement is generally to be considered a retirement-type subsidy. The committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance), or a plant shutdown benefit (that does not continue after retirement age ) will not be considered a retirement-type subsidy.
 
 
 36
 S.Rep. No. 575, 98th Cong.2d Sess. 30, reprinted in 1984 U.S.Code Cong. & Admin.News 2547, 2576 (emphasis added). We read the Senate Report to mean that shutdown benefits that do continue after retirement age are a retirement-type subsidy.[4] BSC apparently agrees and accordingly argues that the shutdown benefits at issue here do not continue after retirement age because at age sixty-two the participants stop receiving the $400 per month and then receive only the same amount per month as they would have received if they had retired at age sixty-two. According to BSC, then, the subsidy ends at normal retirement age.
 
 
 37
 BSC's argument is unavailing, however. The shutdown benefits that a BSC employee receives upon a plant shutdown are not miraculously transformed into normal retirement benefits when the recipient reaches age sixty-two. Rather, the employee receives shutdown benefits from the time the plant closes until death. Granted, the amount of shutdown benefits the participant is entitled to receive is calculated by reference to normal retirement benefits, but that does not transform the shutdown benefits into normal retirement benefits.
 
 
 38
 We find additional support for our conclusion in a Treasury Department General Counsel Memorandum that addresses section 411(d)(6) of the Internal Revenue Code.[5] The Memorandum defines different types of shutdown benefits as follows:
 
 
 39
 Some shutdown benefits are provided in a form similar to severance benefits. They are short-term in nature and are a supplement or replacement of the participant's income during the period of unemployment. These benefits are provided for a limited period of time after the termination of the individual's employment and the amount of the benefit is generally determined either as a flat amount or as a multiple or fraction of the individual's annual compensation....
 
 
 40
 Alternatively, shutdown benefits may continue beyond normal retirement age, i.e., retirement-type benefits. Generally, shutdown benefits provide an incentive to employees who are at or near normal retirement age to retire at the time of a plant shutdown. For example, the employer ... may supplement the accrued benefit of the individual.
 
 
 41
 Gen.Couns.Mem. 39869 (Apr. 6, 1992). Accordingly, we conclude that the shutdown benefits at issue here continue after normal retirement age, and thus are retirement-type subsidies for purposes of section 1054(g).
 
 2
 
 42
 BSC's second argument is that even if the shutdown benefits are retirement-type subsidies, appellants are not protected by section 1054, because their benefits did not accrue before the amendment. That is, the shutdown did not occur until after BSC eliminated shutdown benefits. We must reject this argument as well.
 
 
 43
 Section 1054(g) explicitly provides protection against amendment of retirement-type subsidies so long as the participant satisfies the preamendment conditions for the subsidy "either before or after the amendment." Further, an IRS revenue ruling concerning retirement-type subsidies under IRC Sec. 411(d)(6) states that "[a] participant could, after the date of the proposed [amendment], satisfy the [preamendment] conditions necessary to receive this retirement-type subsidy." Rev.Rule 85-6, 1985-1 C.B. 133 (emphasis added).
 
 
 44
 Here, SSI's 1991 sale to Salmon Bay was a shutdown; at that point, appellants satisfied the "preamendment conditions" for the shutdown benefits. Because the shutdown benefits are a retirement-type subsidy, section 1054(g) precluded BSC from eliminating them.
 
 
 45
 In sum, although we reject the former employees' interpretation of the MOS as preserving their right to benefits, they nonetheless achieve the same goal on this alternative theory. BSC's attempt to amend the Plan and the Agreement was ineffective under ERISA. Consequently, the former employees are entitled to shutdown benefits dating from the time that SSI ceased its operations.
 
 IV
 
 46
 Finally, the former employees contend that, because the General Pension Board knew or should have known that BSC's sale to SSI was a sham,[6] the General Pension Board breached its fiduciary duties under Sec. 404(a) of ERISA, 29 U.S.C. Secs. 1104(a)(1)(A), (B) and (C) by adopting the Rules and Regulations, stating that the sale to SSI was not a break in service. The district court dismissed appellants' claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, finding that appellants had failed to state a claim.
 
 
 47
 The district court held that individual plaintiffs cannot bring claims alleging a breach of fiduciary duty for their own benefit; rather, the benefit must inure to the Plan as a whole. The district court relied for its holding on Horan v. Kaiser Steel Retirement Plan, 947 F.2d 1412 (9th Cir.1991). Horan, however, does not apply here. In Horan, the plaintiffs sought to impose personal liability on Plan fiduciaries; the Horan plaintiffs asked the court to order the defendants to purchase annuities to which the plaintiffs believed they were entitled. We dismissed the plaintiffs' claims on the ground that "[a]n individual beneficiary may not pursue a fiduciary breach claim to recover benefits or remedies beyond those provided by a plan." Id. at 1417.
 
 
 48
 Horan is not applicable to the instant case because the former employees here seek to recover only those benefits specifically provided by the Plan. ERISA authorizes a participant to bring a civil action "to recover benefits due to him under the terms of the plan." 29 U.S.C. Sec. 1132(a)(1)(B). In Meagher v. IAM Pension Plan, 856 F.2d 1418 (9th Cir.1988), cert. denied, 490 U.S. 1039, 109 S.Ct. 1943, 104 L.Ed.2d 414 (1989), we held that each time an administrator denied a participant the benefits due him, it breached its fiduciary duty, and each improper denial of benefits gave rise to a separate cause of action under 29 U.S.C. Sec. 1132(a)(1)(B).
 
 
 49
 Because the appellants were entitled to bring an action for restitution of the benefits due them, the district court erred in dismissing their claim.
 
 V
 
 50
 In conclusion, although we agree with the district court that the language of the MOS did not preserve the former employees' right to shutdown benefits, we must nonetheless reverse because by eliminating the shutdown benefits BSC violated 29 U.S.C. Sec. 1054(g). We also must reverse the district court's Rule 12(b)(6) dismissal of appellants' claim for breach of fiduciary duty and remand for further proceedings.
 
 
 51
 AFFIRMED in part, REVERSED in part, and REMANDED. Each party shall bear its own costs.
 
 
 
 [1]
 More fully, these sections provide:
 70/80 RETIREMENT
 
 
 [2]
 6 Any participant who has not attained the age of 62 years and who shall have had at least 15 years of continuous service and (i) shall have attained the age of 55 years and whose combined age and years of continuous service shall equal 70 or more, or (ii) whose combined age and years of continuous service shall equal 80 or more, and
 (a) whose continuous service is broken by reason of a permanent shutdown of a plant, department or subdivision thereof or by reason of a layoff or physical disability
 shall be eligible to retire on or after February 28, 1983, and shall upon his retirement (hereinafter "70/80 retirement") shall be eligible for a pension; ....
 RULE-OF-65 RETIREMENT
 
 
 [2]
 7 Any participant (i) who shall have had at least 20 years of continuous service as of his last day worked, (ii) who has not attained the age of 55 years, and (iii) whose combined age and years of continuous service shall equal 65 or more but less than 80, and
 (a) whose continuous service is broken by reason of a layoff or disability, or
 (b) whose continuous service is not broken and who is absent from work by reason of a layoff resulting from his election to be placed on layoff status as a result of a permanent shutdown of a plant ...
 and who has not been offered suitable long-term employment ... shall be eligible to retire on or after February 28, 1983, and shall upon his retirement (hereinafter "rule-of-65 retirement") be eligible for a pension....
 
 
 [2]
 In an alternative attempt to prevent the court from considering the extrinsic evidence, the former employees contend that the parties' unwritten intent is irrelevant because "oral agreements are not competent to modify written employee benefit plans."
 Because 29 U.S.C. Sec. 1102 provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," courts have held that oral agreements or modifications cannot be used to contradict or supersede the written terms of an ERISA plan. Schoonmaker v. Employee Sav. Plan, 987 F.2d 410, 412 (7th Cir.1993); Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1296 (5th Cir.1989). However, courts have distinguished between oral statements that contradict or supersede the terms of an ERISA plan and oral interpretations of a plan's provisions that are not contrary to the plan's written provisions. Schoonmaker, 987 F.2d at 412; see also Kane v. Aetna Life Ins., 893 F.2d 1283, 1285-86 (11th Cir.), cert. denied, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (holding that an oral interpretation of an ambiguous plan provision will be given effect). Appeal to the "no oral modification" rule thus is unpersuasive because the extrinsic evidence at issue here did not "modify" the MOS, but merely interpreted it.
 
 
 [3]
 There, we did not need to reach the section 1054(g) issue because we determined that the trustees' use of the provision authorizing cancelation was an improper vesting schedule amendment in violation of 29 U.S.C. Sec. 1053
 
 
 [4]
 Accordingly, we decline to follow Ross v. Pension Plan for Hourly Employees of SKF Indus., 847 F.2d 329 (6th Cir.1988), where the Sixth Circuit read the above-quoted Senate Report as stating that shutdown benefits can never be included in the definition of "retirement-type subsidy." We believe that if Congress had wanted to indicate that shutdown benefits were not retirement-type subsidies, it would have said so. By contrast, Congress said only that a shutdown benefit "that does not continue after normal retirement" was not a retirement-type subsidy. That statement, in conjunction with Congress' general assertion that a subsidy that continues after retirement is a retirement-type subsidy strongly implies that shutdown benefits that do continue after retirement age are retirement-type subsidies
 
 
 [5]
 Qualified pension plans such as the one at issue here must comply with both the Internal Revenue Code and ERISA. The language of Sec. 411(d)(6) of the Internal Revenue Code is identical to that of 29 U.S.C. Sec. 1054(g)
 
 
 [6]
 Appellants claim that BSC knew at the time of the sale that SSI was sure to fail