**Stanhope A. FORD, Plaintiff**

v.

**OWENS–ILLINOIS, INC., Defendant.**

**Case No. 3:07CV1828.**

United States District Court,
N.D. Ohio,
Western Division.

Oct. 25, 2012.

John J. McHugh, III, McHugh & McCarthy, Sylvania, OH, for Plaintiff.

Robert A. Koenig, James H. O'Doherty, John J. Siciliano, Shumaker, Loop & Kendrick, Toledo, OH, for Defendant.

## ORDER

JAMES G. CARR, Senior District Judge.

This is an employee benefits case. Plaintiff's complaint (Doc. 51) alleges violations of ERISA's anti-cutback and fiduciary duty provisions. Plaintiff also alleges common law fraud and estoppel claims. Pending is defendant's motion for summary judgment (Doc. 83).

Jurisdiction exists under 28 U.S.C. § 1331.

For the reasons that follow, I grant the defendant's motion in part, and deny it in part.

### Factual Background

In December 2003, Owens–Illinois (OI) employed plaintiff as the Vice President of its Closure and Special Products Division.

Around this time, OI began contemplating selling the division plaintiff managed to Graham Packaging Company (Graham).

On December 18, 2003, OI and plaintiff entered into an agreement regarding plaintiff's continued employment following the sale to Graham. Plaintiff agreed to remain at the company during the transition period. In exchange, OI offered plaintiff enhanced retirement benefits.

The written agreement provided, *inter alia,* that Ford would: be entitled to retire pursuant to the "RIF" [Reduction in Force] retirement provisions of the Company's Salaried Retirement Plan with [his] retirement benefit calculated on the base of eighty (80) age service "RIF" points ... [if]] prior to 9/30/2006, while [Ford is] an employee of the Company, there is any materially adverse change in [his] job duties, responsibili-

ties, compensation including compensation level ... or benefits including pension benefits.

(Doc. 51–2).

Plaintiff accepted the offer.

On July 28, 2004, OI entered into a definite sale agreement with Graham. On October 7, 2004, OI completed the sale. Plaintiff participated in these events. He remained active during the ensuing transition phase.

In December 2004, OI announced several amendments to the salary retirement plan (SRP). One amendment provided that § 8.05 of the SRP, which created the RIF benefits, would no longer be available to employees whose service ended on or after January 1, 2005. Another amendment eliminated lump sum payment of benefits for services performed on or after that date.

On receiving notice of the amendments, plaintiff asked OI for written assurance that the SRP amendments (including the amendment to § 8.05) did not affect his December 2003, agreement, which expressly anticipated plaintiff's continued service past December 31, 2004.

On December 28, 2004, OI, responding to plaintiff' inquiry, assured plaintiff, in writing, that the enhanced benefits OI promised in the December 18, 2003 agreement would still be available to plaintiff if he retired after January 1, 2005. OI's response stated, *inter alia,*:

1. You are correct in your understanding that subparagraph (2) on page 1 of your December 18, 2003 letter agreement (the "Agreement") has been triggered.

2. Pursuant to the Agreement, you can retire at any time prior to 9/30/2006 and receive the RIF retirement benefits specified in the Agreement.

3. You do not need to take any action at this time to confirm or secure your rights under the agreement.

4. In the event you were to retire before 9/30/2006, your RIF retirement benefit would be payable in the following manner (reflecting the 1/1/05 amendment of the Salaried Retirement Plan):

a. a lump sum (if so elected) amount calculated as of 12/31/04 and payable in part from the Qualified Plan and in part from the Nonqualified Plan; and

b. an annuity amount calculated based on your final covered compensation and your service from 1/1/05 until your retirement date (a part of which annuity may likewise be paid from the Nonqualified plan).

(Doc. 51–2).

In addition to providing this written assurance, OI promised to provide, and provided plaintiff, written projections of his retirement benefits. OI sent plaintiff two separate projections. Each projection contained several pages of calculations and confirmed that plaintiff was entitled to the enhanced benefit payment promised in the December 18, 2003 letter agreement. The conclusion at the bottom of each projection stated plaintiff was entitled to a lump sum payment of approximately one million dollars. Each projection stated a disbursement date after January 1, 2005.

OI does not dispute that the complexity of the benefit calculations precluded plaintiff from independently confirming or denying their accuracy.

On June 1, 2006, plaintiff retired.

Plaintiff alleges (and OI does not appear to dispute) that he decided to continue working beyond January 1, 2005 because of OI's written assurance on December 28, 2004 as to his RIF benefits and the benefit projections. Plaintiff states (and, again, OI does not appear to dispute) that if OI had not provided these assurances, he would have retired on or before December 31, 2004.

The gravamen of this suit is that OI, when it paid RIF benefits to the plaintiff, did so on the basis of the amendment to § 8.05, rather than in accordance with the terms of the December 18, 2003 agreement. This appears to be so, as is the fact that, as a result, plaintiff received substantially less than if OI had paid as promised in the December 18, 2003 agreement.

OI contends that the amendment to § 8.05, not the December 18, 2003 agreement and the December 28, 2004, confirmation of its obligation under the 2003 agreement, controls what plaintiff was to receive when he retired.

The outcome of this dispute matters: plaintiff claims the December 28, 2003 agreement: 1) entitled him to a lump sum distribution of about one million dollars, and, 2) would have enable him to have rolled that payment over into an IRA. Doing so would have allowed plaintiff to defer taxation on his benefits until he started receiving distributions from his IRA.

Instead, OI paid plaintiff a lump sum of $573,799.64. In addition to being almost half of the amount plaintiff expected to receive, taxation was immediate. After taxes plaintiff received $366,564.21.

## Standard of Review

A party is entitled to summary judgment on motion under Fed.R.Civ.P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex, supra,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding a motion for summary judgment, I accept the opponent's evidence as true and construe all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of material fact. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. 2548.

### Discussion

The issues in this case are:
- Whether the amendment eliminating plaintiff's RIF benefits violated ERISA's anti-cutback rule;
- Whether OI breached its fiduciary duty by eliminating plaintiff's RIF benefits and/or misrepresenting to plaintiff his right to benefits under the plan;
- Whether OI committed fraud by assuring plaintiff of enhanced benefits; and
- Whether OI is equitably estopped from denying plaintiff the RIF benefits promised in the letter agreement.

### 1. The Anti–Cutback Rule

Plaintiff claims that the RIF benefits OI promised to pay him in the event of a material change in his position are either early retirement benefits, retirement-type subsidies, or both. As such, plaintiff contends that ERISA's anti-cutback provision, 29 U.S.C. § 1054(g) (quoted below), protects his benefits from the reduction OI unilaterally (and, he contends, unlawfully) imposed on him.

OI argues that § 1054(g) expressly excludes benefits of the kind plaintiff received from its anti-cutback proscription.

In essence, though not expressly, OI argues that plaintiff's RIF benefits are welfare benefit, and thus not protected by the anti-cutback provision.

### a. The Anti–Cutback Rule

The relevant statutory provision reads:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of-

   (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

   (B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.

29 U.S.C. § 1054(g).

Prior to 1984, the anti-cutback rule only prohibited the reduction of accrued benefits, and thus "did not protect early retirement benefits or retirement-type subsidies because they were not considered to be

accrued benefits." *Bellas v. CBS, Inc.*, 221 F.3d 517, 522 (3rd Cir.2000). In 1984, Congress amended the anti-cutback statute to protect early retirement benefits. Instead of changing the existing definition of accrued benefit, Congress expanded the scope of § 1054(g) to include three new categories: early retirement benefits, retirement type subsidies, and optional benefits. *Bellas, supra*, 221 F.3d at 523. Congress did not, however, define these new categories. *See Ross v. Pension Plan for Hourly Emp. of SKF Indus., Inc.*, 847 F.2d 329, 333 (6th Cir.1988); *Bellas, supra*, 221 F.3d at 524.

The Sixth Circuit, using the "plain and widely understood meaning of the terms," has stated that "early retirement benefits are generally benefits that become available upon retirement at or after a specified age which is below the normal retirement age, and/or upon completion of a specified period of service." *Ross, supra*, 847 F.2d at 333. The court also stated that "[a]n optional form of benefit is generally one that involves the power or right of an employee to choose the way in which payments due to him under a plan will be made or applied." *Id.*

Early retirement subsidies are payments that provide an early retirement benefit greater than the actuarial equivalent of the normal retirement benefit. *Bellas, supra*, 221 F.3d at 525 (citing Dan M. McGill & Donald S. Grubbs Jr., FUNDAMENTALS OF PRIVATE PENSIONS, 131–35 (6th ed. 1989)).

### b. Pension Benefits v. Welfare Benefits

To understand whether plaintiff's benefits are in fact the type of benefits the anti-cutback rule protects, it is helpful to discuss ERISA's basic structure of protections for various types of benefit plans. "ERISA divides the universe of employee benefit plans into *pension benefit plans* (or *pension plans*) and *welfare benefit plans* (or *welfare plans*). *See Adams v. Avondale Industries Inc.*, 905 F.2d 943, 947 (6th Cir.1990). Pension benefit plans provide retirement income to employees. 29 U.S.C. § 1002(2)(A)(i). The form of payment of retirement income, lump sum or annuity, is immaterial. *Id.*

Welfare benefit plans provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services ..." or other benefits "other than pensions on retirement or death." 29 U.S.C. § 1002(1). Severance benefits are welfare benefits, not pension benefits. 29 C.F.R. § 2510.3–2(b) (stating that a severance payment is a welfare benefit rather than a pension benefit if the payment is not directly or indirectly contingent upon retirement, payment does not exceed twice employee's annual compensation, and payments cease within two years of termination or employee's reaching retirement age); *see also Adams, supra*, 905 F.2d at 947.

The anti-cutback provision is found in Title one, Subtitle b, part two of the Act. 29 U.S.C. § 1054, *et seq.* The provisions therein protect pension benefits. This portion of ERISA protects pension benefits by: imposing minimum standards for benefit eligibility; requiring benefits to become legally enforceable within a reasonable period of time; and imposing minimum rates at which benefits must accrue. *See* 29 U.S.C. §§ 1052, 1053, 1054. These sections, which include the anti-cut back provision, do not protect *welfare benefits.* 29 U.S.C. § 1051(a).

■ OI argues that the anti-cutback provision, despite its placement among provisions relating to pension benefits, does not cover RIF benefits. This is so, OI contends, because RIF benefits are contingent on a reduction in force, rather than conventional retirement. Acceptance of this view would mean that RIF benefits are, by default, within the only other category of ERISA benefits—namely, welfare benefits. By its own terms, the anti-cutback rule protects only retirement benefits. But characterizing RIF benefits as welfare benefits is problematic. Most simply put, retirement benefits are not within the compass of *welfare* benefits—which ERISA limits to medical, sickness, disability, death, vacation, apprenticeship, day care, scholarship, or pre-paid legal benefits.[1]

OI relies, however, on *Ross, supra,* 847 F.2d 329, to support an argument that the Sixth Circuit has adopted a *per se* rule which excludes both plant shutdown and RIF benefits from the anti-cutback rule. OI contends that benefit payments resulting from a plant shutdown or RIF are not early retirement benefits. In essence, OI argues that making early retirement payments contingent on a plant shutdown or RIF transforms the benefit into a new category of welfare benefit. Consequently, in OI's view, the anti-cutback is inapplicable to RIF benefits.

In other words, according to OI, RIF benefits, even though not fitting within a statutorily specified category of welfare benefits, should be deemed to be an unenumerated equivalent of a conventional welfare benefit. If so, the anti-cutback rule does not protect plaintiff against OI's unilateral reduction in his RIF benefits.

In *Ross,* the retirement plan provided for plant shutdown benefits. 847 F.2d at 330. In the event of a shutdown, retirees were entitled to the immediate payment of pension benefits equal to the amount a participant would otherwise be paid at normal retirement age. *Id.* at 331. The benefits were payable only if a participant had fifteen years' experience and was at least fifty-five or had a combined age and service of eighty or more. *Id.* The court concluded that the shutdown benefits could not be considered either early retirement benefits or retirement subsidies as referenced in § 1054(g)(2)(A). *Id.*

Plaintiff contends that *Ross* does not declare a *per se* rule precluding all shutdown and RIF benefits from coverage under the anti-cutback rule. Plaintiff's contention is supported by the court's holding in *Ross,* which stated narrowly that "the benefits which the Pension Plan provides in the event of a plant shutdown are not benefits protected under 204(g)." *Id.* at 330. The Sixth Circuit's phrasing shows an intent to decide only whether the anti-cutback rule covered the particular shutdown benefit at issue in the plan in that case.

The benefit in *Ross* is distinguishable from the benefit here for two additional reasons. First, the *Ross* case dealt narrowly with the issue of *plant shutdown* benefits. The court never discussed RIF

---

1. RIF benefits are also not a form of severance benefit. The regulations make clear that payments are not severance benefits if they are contingent on retirement, exceed twice employee's annual compensation, or continue for more than two years. 29 C.F.R. § 2510.3–2(b).

Under § 8.05 of the OI plan, the benefit at issue was both contingent on an employees retirement and payments were to continue for more than two years after the employee retired. Furthermore, the December 18, 2003 agreement provided for a separate severance payment of "six month's base salary" in addition to the enhanced benefits. (Doc. 51–2).

benefits or any other type of contingent retirement benefits.

Second, the court in *Ross* did not address whether the benefit in that case continued after the employee's retirement. In fact, the court's reasoning implied that the shutdown benefit did not continue after the employee's retirement.[2]

I conclude, accordingly, that, contrary to OI's contentions, the Sixth Circuit has yet to decide whether the anti-cutback rule protects early retirement benefits contingent on a reduction in force.

The Third Circuit's decision in *Bellas, supra,* dealt with a benefit similar to the RIF benefits in this case. The plan in *Bellas* provided a permanent job separation benefit, which the plan defined as a "termination of the employment of an employee ... through no fault of his own through lack of work for reasons associated with the business for whom [the employer] determines there is no reasonable expectation of recall." 221 F.3d at 518. An employee terminated under these circumstances could retire if he or she satisfied certain age and service requirements. *Id.* On retirement the employee was to receive a monthly pension equal to the normal retirement pension plus additional amounts for life. *Id.* at 520.

The plan administrators sought to amend the plan to exclude the permanent job separation benefit. *Bellas, supra,* 221 F.3d at 520. The Third Circuit held that "contingent event benefits that provide a benefit greater than the actuarially reduced normal retirement benefit are retirement-type subsidies, and therefore are accrued benefits under section 204(g), if the benefit continues beyond normal retirement age."

Unlike the shutdown benefit in *Ross,* the employee separation benefit in *Bellas* is analogous to the RIF benefit eliminated in this case. The separation benefit in *Bellas* was contingent on a layoff or RIF event, and it was clear from the plan that the benefit continued after retirement.

In *Bellas,* the Third Circuit followed the Sixth Circuit's approach to interpreting the status of contingent event benefits (as either welfare or pension benefits) in light of the guidance provided by the legislative history. The portion of the committee record on which both circuits relied states:

> The committee intends that under these regulations, a subsidy that continues after retirement is generally to be considered a retirement-type subsidy. The committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance), or a plant shutdown benefit (that does not continue after retirement age) will not be considered a retirement-type subsidy.

---

**2.** It appears that the court used a simple *modus tollens* argument form. If a shutdown benefit continues after retirement then it is a retirement type subsidy. The shutdown benefit at issue does not continue after retirement. Therefore, the shutdown benefit is not a retirement type subsidy.

The Sixth Circuit began with a description of the shutdown benefit that did not state that the payments at issue continued after an employee retired. *Ross, supra,* 847 F.2d at 330. The court then stated that the legislative history of ERISA specifically addresses the issue of whether a plant shutdown benefit may be

considered a retirement type subsidy. *Id.* at 333. The court noted that the legislative history explicitly provides: "a subsidy that continues after retirement is generally to be considered a retirement-type subsidy" and "a plant shutdown benefit (that does not continue after retirement age) will not be considered a retirement-type subsidy." *Id.* (citing S.Rep. No. 575, 98th Cong., 2d Sess. 30, reprinted in 1984 U.S.Code Cong. & Admin. News 2547, 2576). Finally, the court concluded that the shutdown benefit at issue was not a retirement type subsidy.

*Id.* at 529 (quoting S.Rep. No. 575 at 30, reprinted in 1984 U.S.C.C.A.N. 2547, 2576).

In light of the legislative history's clear indication that plant shutdown benefits continuing after retirement were to be considered retirement type subsidies, the Third Circuit, as I have done here, declined to interpret the holding in *Ross* as a *per se* rule. *Bellas, supra,* 221 F.3d at 529.

### c. IRS General Counsel Opinion on Status of Contingent Event Benefits

After reviewing the legislative history, the Third Circuit turned in *Bellas, supra,* to Treasury Department General Counsel Memorandum 39869. *Id.* at 530. In the memorandum the IRS explicitly stated that contingent event benefits may be considered early retirement benefits. *Id.*[3]

In Memorandum 39869, the IRS rejected a *per se* rule excluding from the category of retirement-type benefits all shutdown and RIF benefits. GCM (IRS GCM), 1992 WL 798073. "Whether shutdown benefits may be provided in a qualified pension plan is not determined solely by the event that triggers the payment of the benefit but rather by the terms of the benefit including the form of the benefit that is being provided." *Id.* Shutdown benefits are retirement type subsidies if they become payable because of plant shutdown and are in the form of annuity payments that continue after retirement. *Id.* Shutdown benefits that take the form of retirement type subsidies are protected benefits under the anti-cutback rule. *Id.*

The Memorandum went on to state that shutdown benefits that are in the form of a severance benefit may not be provided in a qualified pension plan. *Id.* Shutdown benefits take the form of a severance benefit if they are provided for a limited period of time and intended to be a short-term replacement of employment income. *Id.*

In the Memorandum, the General Counsel agreed with both the Sixth and Third Circuits that Congress intended to protect as pension benefits those shutdown payments continuing after retirement. *Id.* The Memorandum cited the legislative history:

> A subsidy that continues after retirement is generally to be considered a retirement-type subsidy ... A qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance), or A PLANT SHUTDOWN BENEFIT (THAT DOES NOT CONTINUE AFTER NORMAL RETIREMENT AGE) will not be considered a retirement-type subsidy.

*Id.* (emphasis in original) (citing S.R. No. 575, 98th. Cong., 2d Sess. 30 (1984)).

■ The General Counsel Memorandum makes clear that there is no *per se* rule precluding all contingent event benefits from protection under the anti-cutback rule. The determination of whether a contingent event benefit is a pension-retirement benefit protected under the anti-cutback rule or a severance-welfare benefit that can be eliminated at the will of plan administrators depends on the form of the benefit. Specifically, the determination depends on whether the benefit at issue continues after retirement.

■ The majority of other circuits that have reached the issue agree with the

---

**3.** It was appropriate for the General Counsel to opine on this issue because the Department and IRS have regulatory jurisdiction over benefit accrual, vesting, and the anti-cutback provision. *Cent. Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 747–48, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004).

Third Circuit's conclusion that not all contingent event benefits are outside the anti-cutback rule. *See Richardson v. Pension Plan of Bethlehem Steel Corp. and Subsidiary Co.*, 67 F.3d 1462, 1469 (9th Cir.1995) (concluding that shutdown benefits continuing after retirement are protected under the anti-cutback rule), *opinion withdrawn on other grounds; Arena v. ABB Power T & D Co., Inc.*, 2003 WL 21766568, \*12 (S.D.Ind.), *interlocutory appeal denied*, 2004 WL 826389 \*1 n. 1 (concluding that benefits contingent on permanent job separation (RIF or layoff type events) are protected under the anti-cutback rule); *Harms v. Cavenham*, 984 F.2d 686, 688, 692 (5th Cir.1993) (concluding that retirement benefits conditioned on change in control are protected under the anti-cutback rule). *But see Roper v. Pullman Standard*, 859 F.2d 1472, 1473 (11th Cir. 1988) (dictum) (interpreting a provision other than 29 U.S.C. § 1054(g), but concluding that the shutdown benefit would not be protected under the anti-cutback rule).

### d. Regulatory Guidance on Status of Contingent Event Benefits

In addition to being in agreement with the majority of courts that have reached the issue and the IRS guidance, recent treasury regulations also support protecting the benefit at issue in this case. The regulations state explicitly that early retirement benefits conditioned on contingent events are protected under the anti-cutback rule. 26 C.F.R. § 1.411(d)–3(b)(4)(ii) example 2.[4]

4. Example 2. (i) Facts involving plant shutdown benefits. Plan B permits participants who have a severance from employment before normal retirement age (age 65) to commence distributions at any time after age 55 with the amount payable to be actuarially reduced using reasonable actuarial assumptions regarding interest and mortality specified in the plan, but provides that the annual reduction for any participant who has at least 20 years of service and who has a severance from employment after age 55 is only 3% per year (which is a smaller reduction than would apply under reasonable actuarial reductions). Plan B also provides 2 plant shutdown benefits to participants who have a severance of employment as a result of a plant shutdown. First, the favorable 3% per year actuarial reduction applies for commencement of benefits after age 55 and before age 65 for any participant who has at least 10 years of service and who has a severance from employment as a result of a plant shutdown. Second, all participants who have at least 20 years of service and who have a severance from employment after age 55 (and before normal retirement age at age 65) as a result of a plant shutdown will receive supplemental payments. Under the supplemental payments, an additional amount equal to the participant's estimated old-age insurance benefit under the Social Security Act is payable until age 65. The supplemental payments are not a QSUPP, as defined in § 1.401(a)(4)–12, because the plan's terms do not state that the supplement is treated as an early retirement benefit that is protected under section 411(d)(6).

(ii) Conclusion with respect to plant shutdown benefits. The benefits payable with the 3% annual reduction are retirement-type benefits. The excess of the actuarial present value of the early retirement benefit using the 3% annual reduction over the actuarial present value of the normal retirement benefit is a retirement-type subsidy and the right to receive payments of the benefit at age 55 is an early retirement benefit. These conclusions apply not only with respect to the rights that apply to participants who have at least 20 years of service, but also to participants with at least 10 years of service who have a severance from employment as a result of a plant shutdown. Thus, the right to receive benefits based on a 3% annual reduction for participants with at least 10 years of service at the time of a plant shutdown is an early retirement benefit that provides a retirement-type subsidy and is a section 411(d)(6)(B) protected benefit (even though no plant shutdown has occurred). Therefore, a plan amendment cannot eliminate this benefit with respect to benefits accrued before the applicable amendment date, even before the occurrence of the plant shutdown. Because the plan provides

■ The material facts concerning the RIF benefit are undisputed. The benefit was contingent on a RIF, provided payments greater than the actuarial equivalent of the normal retirement benefit, and was to continue to be paid after retirement. As such, I conclude as a matter of law that the benefit was protected under the anti-cutback rule, 29 U.S.C. § 1054(g).[5]

## 2. Breach of Fiduciary Duty

The next issue is whether plaintiff may sue OI for breach of fiduciary duty.

Plaintiff asserts he has standing to sue and may seek an individual remedy for breach of fiduciary duties. Plaintiff contends OI breached its fiduciary duties when it: 1) amended the plan to eliminate his vested early retirement benefits under the December 18, 2003 agreement; and 2) misrepresented the plan amendment's effect on his rights.

OI contends plaintiff does not have standing to sue because remedies for breach of fiduciary duties inure only to the plan, not to individual plan participants. Moreover, according to OI, a plan amendment is a business decision, not a fiduciary act. With regard to the claim that it breached a fiduciary duty running to the plaintiff individually (i.e., by misrepresenting the effect of the amendment on the 2003 agreement), OI claims that an accidental misrepresentation cannot constitute a breach of fiduciary duty.

### a. Standing to Sue for Breach of Fiduciary Duty

In the past, because of an apparent incongruency between two provisions in the Act, confusion arose over whether a plan participant could individually recover a remedy for breach of fiduciary duty. On its face, the Act seems to give individual plan participants standing to sue for such breaches, though allowing recovery only on behalf of the plan itself. On this reading, a plan participant could sue in a derivative capacity, not for personal benefit, but for that of the plan.

The first provision at issue gives an individual plan participant standing to bring a suit to recover benefits due under a benefit plan, for appropriate relief for breach of fiduciary duty, or to obtain equitable relief to redress violations of the Act. 29 U.S.C. § 1132(a).

The second provision at issue states a fiduciary who breaches his or her duties shall be "personally liable to make good to *such plan* any losses to *the plan* resulting from each such breach, and to restore to *such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a).

■ The Supreme Court resolved the statutory interpretation dilemma in favor of plan participants in *Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S.Ct. 1065,

---

that the supplemental payments cannot exceed the OASDI benefit under the Social Security Act, the supplemental payments constitute a social security supplement (but not a QSUPP as defined in § 1.401(a)(4)–12), which is an ancillary benefit that is not a section 411(d)(6)(B) protected benefit and accordingly is not taken into account in determining whether a prohibited reduction has occurred.

**5.** Plaintiff did not file a counter-motion for summary judgment. On the basis of my conclusion as to his first cause of action, he may, if he desires to do so, file such motion. He should indicate whether he desires to do so at the status/scheduling conference to be scheduled on the filing of this Order.

134 L.Ed.2d 130 (1996). "Granting a remedy" to individual plan participants for breach of fiduciary duty, the Court stated, "is consistent with the literal language of the statute, the Act's purposes, and pre-existing trust law." *Id.* Accordingly, it is now clear that individuals may seek equitable relief for breaches of fiduciary duty. *Id.* at 509, 116 S.Ct. 1065.

▮ In our Circuit, equitable relief refers to "categories of relief that were typically available in equity." *Alexander v. Bosch Auto. Sys., Inc.*, 232 Fed.Appx. 491, 496 (6th Cir.2007) (citing *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)). Equitable remedies include injunctions and restitution, but not compensatory damages. *Id.* "A plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 500.

OI points out that plaintiff's complaint requests reformation. Under *Alexander*, plaintiff may not seek reformation. *See* 232 Fed.Appx. at 498 (stating that reformation is appropriate only if parties reach an agreement and inadequately or mistakenly record the agreement in a writing). According to OI, reformation is inappropriate because there was no preexisting error or mistake in the amended plan.

▮ Though reformation may not be available, the prayer for relief in plaintiff's complaint requests any appropriate equitable relief. Plaintiff's claim for the benefits allegedly owed to him create a genuine issue of material fact as to whether restitution or some other form of equitable relief to compel return of the benefits may be appropriate. Thus, plaintiff has standing, at least to a limited extent, to proceed

further on this claim for breach of fiduciary duty.

### b. Breach of Duty

The next issue is whether amending a benefit plan or providing an interpretation of a beneficiary's rights under a plan are fiduciary acts.

▮ "To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege: 1) the defendant was a fiduciary of an ERISA plan who, 2) acting within his capacity as a fiduciary, 3) engaged in conduct constituting a breach of his fiduciary duty." *Adams v. Anheuser–Busch Co., Inc.*, 2011 WL 1559793, *6 (S.D.Ohio).

▮ Once an employer adopts a plan, "ERISA enforces strict fiduciary standards of care in the administration of pension plans and promotion of the best interests of participants and beneficiaries." *Gromala v. Royal & SunAlliance*, 87 Fed. Appx. 562, 564 (6th Cir.2004).

Under the Act, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1). A fiduciary must exercise the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." *Id.* And a fiduciary must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this title [funding and fiduciary duty provisions]." *Id.*

■ "In every case charging breach of ERISA fiduciary duty, ... the threshold question ... is whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Gromala, supra*, 87 Fed.Appx. at 564. "A person is a fiduciary with respect to a plan to the extent he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A).

### i. Plan Amendment

■ "Employers and plan sponsors are generally free under ERISA to adopt, modify, or terminate plans, for any reason and at any time." *Gromala, supra*, 87 Fed.Appx. at 565. Amendment and plan design are business decisions left to the discretion of plan administrators. However, an amendment reducing vested benefits implicates fiduciary duties. *Id.* Reducing vested benefits violates the protections provided by the anti-cutback rule. ERISA fiduciaries do not have discretion to amend or interpret plans in a manner that violates the Act. 29 U.S.C. § 1104(1).

OI relies on *Gromala* for the proposition that amendments are business decisions, not fiduciary actions. In *Gromala* the court found the amendment in that case was a business decision properly left to the discretion of plan administrators. *Gromala, supra*, 87 Fed.Appx. at 565.

■ The plan participant in *Gromala* claimed a right to benefits under an amendment that plan administrators considered but never adopted. *Gromala, supra*, 87 Fed.Appx. at 563. Here, in contrast, OI amended an established plan. OI's amendment violated the anti-cutback rule. Having violated the anti-cutback rule, there is no basis for claiming the amendment reflected a business decision.

Accordingly, OI is not entitled to summary judgment on this claim.

### ii. Misleading Communications

■ "Misleading communications," the court stated in *Adams, supra*, 2011 WL 1559793 at *11, "to plan participants regarding plan administration, such as eligibility under the plan or the extent of benefits under a plan, will support a claim for breach of fiduciary duty." Thus, "a fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.'" *Id.* (citing *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 432 (6th Cir.2006)).

■ "A misrepresentation is material," the Sixth Circuit stated in *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir.1999), "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision" regarding benefits. Moreover,

> once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even if that requires conveying information about which the beneficiary did not specifically inquire.

*Id.*

Plaintiff argues that OI's written communications misrepresented his rights to his early retirement benefits. This is the case, plaintiff contends, because OI refused to pay plaintiff the enhanced benefits promised in the December 18, 2003 agreement, confirmed in the December 28, 2004,

letter, and reconfirmed by benefit projections.

OI does not dispute that it sent plaintiff the December 28, 2004, letter assuring plaintiff that he would still be entitled to collect the enhanced retirement benefits after the amendment. Nor does OI dispute that it sent plaintiff benefit projections showing plaintiff that he was entitled to collect the enhanced benefits after the amendment.

OI's only argument is that the detailed letter assuring plaintiff that his rights were intact was a mistake and as such should not be considered a breach of fiduciary duty. This contention is unavailing for two reasons.

First, it is simply a lawyer's assertion in a brief; as such it lack evidentiary significance. Second, OI does not provide any authority to support the proposition that an accidental misrepresentation is not a breach of fiduciary duty.

OI is not entitled to summary judgment as to this claim, as to which plaintiff can seek appropriate equitable relief as he requested in his complaint.

### 3. Fraud Claim

The next issue is whether ERISA preempts plaintiff's state law fraud claim.

Plaintiff argues that the letter agreement between plaintiff and OI constitutes a separate retention or employment agreement, and ERISA does not preempt his suit for fraud based on this supplemental agreement.

OI argues that I already considered and rejected the plaintiff's argument during earlier proceedings.

OI is correct. *Ford v. Owens–Illinois*, 2009 WL 3698489, *7 (N.D.Ohio) ("Ford's claims are in essence claims for the recovery of an ERISA plan benefit and are preempted by ERISA.")

Failing to see any new contentions supporting plaintiff's argument that the fraud claim is not preempted, I decline to reconsider the claim here.

### 4. Estoppel Claim

The final issue is whether OI is equitably estopped from denying plaintiff the benefits promised in the letter agreement.

Plaintiff argues that the repeated communications confirming that he was entitled to the enhanced retirement benefits constitute extraordinary circumstances and allow him to recover benefits different from and in excess of those allowed under the plan as amended.

OI argues that plaintiff has failed to show justifiable reliance or extraordinary circumstances justifying a payment of benefits that does not conform to the plan as amended.

"Equitable estoppel may be a viable theory in ERISA cases." *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 456 (6th Cir.2003). In *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 442 (6th Cir.2010), our Circuit described the elements of an ERISA equitable estoppel claim as:

1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

The second and third elements are satisfied by a demonstration that a

defendant's actions "contained an element of fraud, either intended deception or such gross negligence as to amount to constructive fraud." *Bloemker, supra,* 605 F.3d at 442. The undisputed allegations that the plan administrators were aware of the contents of the plan and repeatedly sent written communications assuring plaintiff that he was entitled to benefits in excess of those allowed under the plan satisfy the second and third elements. *See id.* at 443.

Plaintiff has produced three documents from OI. OI sent plaintiff a letter assuring him that he was entitled to enhanced benefits and two multi-page benefit projections. Each benefit projection contained several pages of calculations and confirmed that plaintiff was entitled to the enhanced benefit payment as promised in the letter agreement. OI does not dispute that the complexity of the benefit calculations precluded plaintiff from independently confirming or denying their accuracy. Plaintiff alleges that he justifiably relied on the letter and projections provided by OI because he was unable to perform the calculations himself.

OI relies on the Sixth Circuit's decision in *Crosby v. Rohm & Haas Co.,* 480 F.3d 423, 431 (6th Cir.2007), for the proposition that "a party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party." OI argues that the plan and the brochure explaining the plan that OI sent to plan participants clearly established that the enhanced benefits would no longer be available. OI contends the clear statements in both the plan and brochure preclude plaintiff from establishing the element of justifiable reliance.

█ The Sixth Circuit's later statement in *Bloemker* clarifies when a party may proceed with a claim of equitable estoppel despite unambiguous plan docu-

ments. *Bloemker, supra,* 605 F.3d at 444. Regardless of clear plan language to the contrary, "a plaintiff can invoke equitable estoppel ... where the plaintiff can demonstrate the traditional elements of estoppel, ... plus (1) a written representation; (2) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Id.* at 444.

Plaintiff and OI agree that the requirements of a written representation and complex benefit calculation are met.

Plaintiff contends that the repeated written communications in and of themselves create extraordinary circumstances justifying his reliance on those communications despite the plan language to the contrary.

OI argues that plaintiff's allegations standing alone are insufficient to show extraordinary circumstances.

The court in *Bloemker* explicitly stated that repeated affirmative misrepresentations combined with a participant's diligent request for clarifications regarding his benefits do indeed constitute extraordinary circumstances. *Id.* And in extraordinary circumstances in which the balance of the equities strongly favors the plan participant, estoppel can be applied to vary otherwise unambiguous terms in plan documents. *Id.* at 443–44.

In this case, plaintiff has alleged that he repeatedly requested clarification of his rights, and he has produced documentation showing OI misinformed him of his rights on three separate occasions. The fact of reliance is indisputable; the only question is whether reliance was justifiable.

According to OI, plaintiff's reliance on what its General Counsel and others, pre-

sumably equally knowledgeable, told him was not justifiable.

In effect, according to OI:

"Mr. Ford: You came to us for advice about a plan which we created.

"You did so because you were not sure what we meant.

"Our chief lawyer told you what we meant.

"Our accountants (or actuaries) told you what that meant.

"But all of them were all wrong.

"Shame on you for not knowing that they all were all wrong.

"And as for relying on what was said.

"You should have known better."

OI may perceive nothing extraordinary about these circumstances. A jury might disagree.

That being so, plaintiff has shown that there is a genuine issue of material fact *vis-a-vis* his claim of equitable estoppel.

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT: the motion of defendant Owens–Illinois for summary judgment (Doc. 83) be, and the same hereby is granted with regard to plaintiff's fraud claim and denied as to plaintiff's other claims.

The Clerk shall forthwith schedule a telephonic status/scheduling conference.

So ordered.